**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| RONNIE FORD, RONALD RUSSELL, and TIMOTHY SMITH, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MERCEDES-BENZ GROUP AG, MERCEDES-BENZ GROUP, MERCEDES-BENZ USA, LLC, MERCEDES-BENZ U.S. INTERNATIONAL, INC., and MERCEDES-BENZ VANS, LLC,<br><br>Defendants. | Civil Action No.:<br><br>JURY TRIAL DEMANDED |

**CLASS AND COLLECTIVE ACTION COMPLAINT**

Plaintiffs Ronnie Ford, Ronald Russell, and Timothy Smith ("Plaintiffs"), through their undersigned counsel, individually and on behalf of themselves and non-exempt hourly employees of Mercedes-Benz Group AG, Mercedes-Benz Group, Mercedes-Benz USA, LLC, Mercedes-Benz U.S. International, Inc., and Mercedes-Benz Vans, LLC (collectively, "Mercedes" or "Defendants"), file this Class and Collective Action Complaint ("Complaint") seeking all available remedies under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, and South Carolina Payment of Wages Act ("SCPWA"), S.C. Code Ann § 41-10-10, *et seq*. Plaintiffs assert their FLSA claims as a collective action under 29 U.S.C. §

216(b) and Plaintiff Ford asserts his SCPWA claim as a class action claim pursuant to FED. R. CIV. P. 23.

## JURISDICTION AND VENUE

1. Pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331, this Court has subject matter jurisdiction over Plaintiffs' FLSA claims.

2. This Court has supplemental jurisdiction over the Plaintiff Ford's state law claims pursuant to 28 U.S.C. § 1367, because they arise out of the same transaction or occurrence as Plaintiff's federal claims.

3. This Court also has jurisdiction over Plaintiff Ford's state law claims pursuant to 28 U.S.C. § 1332(d), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant.

4. Pursuant to FED. R. CIV. P. 4(k)(1)(A), GA CODE. § 9-10-91, and federal due process, the Court has general and specific personal jurisdiction over all Defendants. All Defendants maintain continuous and systematic contacts with Georgia, as they all jointly operate the U.S. headquarters in which Plaintiffs and similarly situation employees report. Parent Defendants Mercedes-Benz Group AG, Mercedes-Benz Group, and Mercedes-Benz USA, LLC are the parent entities that own and control the Subsidiaries Defendants, Mercedes-Benz U.S.

International, Inc. and Mercedes-Benz Vans, LLC. All Defendants have availed themselves of Georgia, because they have regularly conducted business in Georgia, and because the FLSA violations and SCPWA violations occurred in Georgia.

5. Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391(b) and (c), because Defendants transact business in, are found in, and/or have agents in this judicial district and division, and because some of the actions giving rise to this Complaint took place within this district and division.

**PARTIES**

6. Plaintiff Ronnie Ford is a resident of Moncks Corner, South Carolina. Pursuant to 29 U.S.C. § 216(b), Plaintiff Ford consented in writing to being a Plaintiff in this action. *See* Ex. A.

7. Plaintiff Ronald Russell is a resident of Hoover, Alabama. Pursuant to 29 U.S.C. § 216(b), Plaintiff Russell consented in writing to being a Plaintiff in this action. *See* Ex. B.

8. Plaintiff Timothy Smith is a resident of Bessemer, Alabama. Pursuant to 29 U.S.C. § 216(b), Plaintiff Smith consented in writing to being a Plaintiff in this action. *See* Ex. C.

9. Defendant Mercedes-Benz Group AG (MB AG), with world headquarters in Stuttgart, Germany, is an automobile design, manufacturing, sale, leasing, distribution and servicing corporation organized under the laws of

Germany. Mercedes-Benz Group AG is the parent corporation of Defendants Mercedes-Benz Group, Mercedes-Benz USA, LLC, Mercedes-Benz U.S. International, Inc., and Mercedes-Benz Vans, LLC.

10. Defendant Mercedes-Benz Group (MBG) is a German corporation with its principal place of business in Stuttgart, Germany.

11. Defendant Mercedes-Benz USA, LLC (MBUSA), is a limited liability company with its principal place of business in Sandy Springs, Georgia. Defendant MBUSA is United States the headquarters for Mercedes-Benz Group. Defendant MBUSA is responsible for the distribution, marketing and customer service for all Mercedes-Benz products in the United States.

12. Defendant Mercedes-Benz U.S. International, Inc. is a Delaware corporation with its principal place of business in Vance, Alabama.

13. Defendant Mercedes-Benz Vans, LLC is a South Carolina limited liability company with its principal place of business in Ladson, South Carolina.

14. At all times material to this action, Defendants have been engaged in commerce or in the production of goods for commerce as defined by the FLSA.

15. Defendants' employees are engaged in interstate commerce and handle or work on goods that have been moved in and/or produced in commerce.

16. Defendants' annual gross volume of sales made, or business done exceeds $500,000.

17. The unlawful acts alleged in this Complaint were committed by

Defendants and/or their officers, agents, employees, or representatives, including as alter egos of one another, while actively engaged in the management of Defendants' businesses or affairs and with the authorization of Defendants.

18. During all times relevant, Plaintiffs were employees of Defendants and are covered by the FLSA.

19. During all times relevant, Defendants were employers and/or enterprise covered by the FLSA.

## CLASS AND COLLECTIVE DEFINITIONS

20. Plaintiffs bring Count I of this lawsuit pursuant to the FLSA, 29 U.S.C. § 216(b), as a collective action on behalf of themselves and the following collective:

> All current and former non-exempt hourly employees of Defendants who worked at production facility and/or, parts distribution center, and/or vehicle preparation center in the United States between August 4, 2022 and the present (the "FLSA Collective").

21. Plaintiffs bring Count I of this lawsuit pursuant to the FLSA, 29 U.S.C. § 216(b), as a collective action on behalf of themselves and the following collective:

> All current and former non-exempt hourly employees of Defendants who received non-discretionary bonuses between August 4, 2022 and the present in the United States (the "Regular Rate Collective").

22. Plaintiff Ford brings Count II of this lawsuit as a class action pursuant to FED. R. CIV. P. 23, on behalf of himself and the following class:

> All current and former non-exempt hourly employees of Defendants who worked in South Carolina between August 4, 2022 and the present (the "South Carolina Class").

23. Plaintiff Ford brings Count II of this lawsuit as a class action pursuant to FED. R. CIV. P. 23, on behalf of himself and the following class:

> All current and former non-exempt hourly employees of Defendants who received non-discretionary bonuses between August 4, 2022 and the present in South Carolina (the "Regular Rate South Carolina Class").

24. The FLSA Collective and Regular Collective are referred to as the "Collectives" and the members of the Collectives are "Collective Members"

25. The South Carolina Class and Regular Rate South Carolina Class are referred to as the "SCPWA Classes"

26. The FLSA Collective, the Regular Rate Collective, the South Carolina Class, and the Regular Rate South Carolina Class are together referred to as the "Classes" and the members of the Classes are "Class Members."

27. Plaintiffs reserve the right to redefine the Classes prior to notice or class certification, and thereafter, as may be warranted or necessary.

## FACTUAL BACKGROUND

### A. Defendants' Manufacturing Operations and Operational Structure

28. Mercedes-Benz Group AG (MB AG), headquartered in Stuttgart, Germany, is responsible for the global business of Mercedes-Benz Cars and Mercedes-Benz Vans, employing over 175,000 individuals worldwide. *See Business Units–Mercedes-Benz AG*, https://group.mercedes-benz.com/company/business-units/mercedes-benz-cars (last visited Jul. 14, 2025).

29. MB AG is the parent company of Mercedes-Benz Group (MBG). MB AG defines the MBG's strategy, manages MBG, and, as the parent company, ensures effectiveness of legal, organizational and compliance-related functions throughout MBG. *Mercedes-Benz Group Annual Report 2024*, MERCEDES-BENZ GROUP, pg. 24 https://group.mercedes-benz.com/documents/investors/reports/annual-report/mercedes-benz/mercedes-benz-annual-report-2024-incl-combined-management-report-mbg-ag.pdf (last visited Jul. 14, 2025).

30. MBG is one of the world's most successful automotive companies and one of the leading global suppliers of high-end passenger cars and premium vans. *Id.*

31. MBG is divided into and controlled by three brand divisions, Mercedes-Benz Cars, Mercedes-Benz Vans, and Mercedes-Benz Mobility. *Id.* Each division pursues a market- and customer-specific strategy. *Id.* at 30. The following graphic provides an overview of MBG and its brands:




*As of 31 December 2024

32. The Board of Management of MB AG is "responsible for directing, coordinating and controlling business activities in accordance with the goals of sustainable value creating it defines for Mercedes-Benz Group AG and Mercedes-Benz Group in the best interest of the Company." *Rules of Procedure of the Board of Management Mercedes-Benz Group AG*, January 2024, at pg. 2 § 1, available at: https://group.mercedes-benz.com/documents/company/corporate-governance/board-of-management/mbg-ag-boardofmanagementrulesofprocedure2024.pdf (last visited Jul. 14, 2025).

33. Mercedes-Benz's U.S. footprint incudes twenty-four (24) locations across the U.S. in thirteen (13) states. These locations include the production of cars and vans, several research and development locations, financial services, and 384

dealer partners in every state. *See Facts and Figures Mercedes-Benz in the US*, December 2024, https://group.mercedes-benz.com/dokumente/unternehmen/sonstiges/mercedes-benz-facts-and-figures-usa.pdf.

34. Together, MB AG and MBG comprise all subsidiaries, including Mercedes-Benz USA (MBUSA), Mercedes-Benz U.S. International, Inc. (MBUSI), and Mercedes-Benz Vans, LLC (MBV Charleston), over which MB AG exercises a controlling influence directly or indirectly. *Id.* At pg. 24, 422.

35. Dating back to 1888 in Long Island City, NY, Mercedes-Benz is the longest-represented car brand in the United States. As a major local investor, Mercedes-Benz has committed over $10 billion in production, infrastructure, research and development, design, and the dealer network, including $7 billion at its Tuscaloosa, AL, site and $560 million in its Charleston, SC, plant. Mercedes-Benz supports more than 163,000 jobs across the country, including 11,100 direct jobs (of which around 8,000 are in manufacturing) and 28,000 dealership employees. *Mercedes-Benz to bring a core segment vehicle to Alabama deepening its commitment to the U.S.*, https://mbusi.com/about/in-the-news/mercedes-benz-to-bring-a-core-segment-vehicle-to-alabama (last visited July 18, 2025).

36. Mercedes-Benz USA (MBUSA), headquartered in Atlanta, Georgia, is the United States headquarters for MBG. MBUSA is responsible for the "distribution, marketing and customer service for all Mercedes-Benz products in

the United States." MERCEDES-BENZ IN NORTH AMERICA, https://group.mercedes-benz.com/company/north-america/mercedes-benz-usa.html (last visited Jul. 14, 2025). It is also responsible for Mercedes-Benz Vans in the United States. *Id.*

37. Mercedes-Benz U.S. International, Inc. (MBUSI), located in Vance, Alabama, is Mercedes-Benz's first passenger vehicle manufacturing facility in the United States. It is part of Mercedes-Benz's "globalization strategy and desire to move closer to its customers and markets." "Mercedes-Benz U.S. International, Inc. (MBUSI) was formed to fulfill the goal of assembling the Mercedes-Benz M-Class Sport Utility Vehicle for the worldwide market." ABOUT – MBUSI, https://mbusi.com/about (last visited Jul. 14, 2025).

38. MBUSI is the largest Mercedes-Benz plant outside of Germany. The Alabama, Tuscaloosa County plant assembles GLE-, GLS-, GLE Coupe and Mercedes-Maybach GLS as well as EQE SUV, EQS SUV and Mercedes-Maybach EQS SUV for all global markets. *Id*. Around two-thirds of MBSUI's production is exported, making MBUSI one of the largest automotive exporters in the United States. Since 1997, four million vehicles have rolled off the assembly line at the Tuscaloosa plant. MERCEDES-BENZ PLANT TUSCALOOSA, https://group.mercedes-benz.com/company/locations/production-network-tuscaloosa.html (last visited Jul. 14, 2025).

39. MBUSI's Tuscaloosa plant consists of two large body shops (where components that comprise the metal body are welded together) that feed into one

paint shop and two assembly shops and a logistics center. The MBUSI's Bibb County plant consists of a Global Customer Services Parts Center (supports dealers across the United States with parts supply, and houses parts inventory required for campaigns), Consolidation Center, and Battery Plant for Electric Vehicles (EVs). FACTS & FIGURES - MBUSI, https://mbusi.com/about/corporate-info/facts-figures (last visited Jul. 14, 2025).

40. MBUSI directly employs around 6,100 individuals.

41. Mercedes-Benz Vans, LLC ("MBV Charleston") is a plant in Ladson, South Carolina, that assembles Sprinter and eSprinter vans for the U.S. and Canadian markets.

42. MBV Charleston is the only Mercedes-Benz Vans production facility in the United States. Since 2006, the Ladson-based facility has assembled more than 400,000 Metris, Sprinter, & eSprinter vans for delivery to destinations across the U.S. and Canada — making it the second largest market for Sprinter vans after Germany. WHO WE ARE - MB VANS CHARLESTON, https://mbvcharleston.com/who-we-are/ (last visited Jul. 14, 2025).

43. MBV Charleston's plant consists of a body shop, a paint shop, and an assembly shop, allowing for full part-by-part assembly of the Metris & Sprinter vans.

44. MBV Charleston directly employs over 1,600 individuals.

45. MBUSA, MBUSI and MBV Charleston are consolidated subsidiaries of MB AG and MBG, and MB AG and MBG maintain a 100% equity interest in the subsidiaries. *Mercedes-Benz Group Annual Report 2024,* MERCEDES-BENZ GROUP, pg. 422 https://group.mercedes-benz.com/documents/investors/reports/annual-report/mercedes-benz/mercedes-benz-annual-report-2024-incl-combined-management-report-mbg-ag.pdf (last visited Jul. 14, 2025).

46. MB AG's "Consolidated Financial Statements" include the financial statements of Mercedes-Benz Group AG and the financial statements of all subsidiaries, including structured entities, which are directly or indirectly controlled by Mercedes-Benz Group AG. According to these statements, "[c]ontrol exists if the parent company has the power of decision over a subsidiary based on voting rights or other rights, if it participates in positive and negative variable returns from a subsidiary, and if it can affect these returns by its power of decision." *Id.* at 299.

47. MBG's website includes a "Careers" page that links job opportunities to its 262 locations worldwide, including openings at MBUSA's corporate headquarters in Gorgia Atlanta, MBUSI's manufacturing plants in Alabama, and MBV Charleston's manufacturing plant in South Carolina. *See* MERCEDES-BENZ LOCATIONS, https://group.mercedes-benz.com/careers/about-us/locations/ (last visited Jul. 14, 2025).

48. Parent Defendants (MB AG, MBG, and MBUSA) expressly supervises and control the policies and practices utilized by the Subsidiary Defendants (MBUSI and MBV Charleston) to pay Plaintiffs and Class Members, including the policies and practices alleged in this Complaint.

49. Press releases from MBUSA demonstrate its operational integration with and oversight over MBUSI and MBV Charleston.

50. In February 2017, MBUSA celebrated the 20-year anniversary of MBUSI's production in Alabama. Markus Schaefer, member of the Divisional Board of Mercedes-Benz Cars, Production and Supply Chain Management, stated: "Looking back on 20 years of production, the Mercedes-Benz plant in Tuscaloosa has been a success story from the beginning. [ ]Tuscaloosa was our first major production facility outside Germany and the nucleus of the automotive industry in Alabama. Meanwhile, the site has become an important part of our global production network contributing to the company's success as the traditional production location for our SUVs, which are produced here for the world market." MERCEDES-BENZ PLANT CELEBRATES MILESTONE ON VALENTINE'S DAY: 20 YEARS OF PRODUCTION IN ALABAMA (February 14, 2017), https://media.mbusa.com/releases/release-dcf8df639d47e31c949304831f0151b8-mercedes-benz-plant-celebrates-milestone-on-valentines-day-20-years-of-production-in-alabama.

51. In August 2022, MBUSA issued a press release detailing production of its new all-electric Mercedes-EQ (EQS SUV) model at MBUSI's Tuscaloosa, Alabama plant. The release stated, "Mercedes-Benz is exclusively producing the all-electric EQS SUV at its North American passenger vehicle plant. . . . The full-size EQS SUV is integrated in series production at the Mercedes-Benz Tuscaloosa plant in Alabama, which has been the production site for large SUVs bearing the three-pointed star since 1997. Tuscaloosa serves as a key production location for Mercedes-EQ luxury electric SUVs: the EQS SUV and EQE SUV, which goes into production later this year." The Release also announces that a new Mercedes-Benz plant in Bibb County, Alabama, will produce the batteries systems for the EQS SUV. START OF PRODUCTION FOR THE NEW EQS SUV AT MERCEDES-BENZ IN ALABAMA (August 5, 2022), https://media.mbusa.com/releases/release-5aa4e93e73d1a130044b1a6f0101f242-start-of-production-for-the-new-eqs-suv-at-mercedes-benz-in-alabama.

52. In 2023, MBUSA and MBUSI jointly sponsored an agreement with the Tuscaloosa City Council to rename the new Mercedes-Benz amphitheater. Dimitris Psillakis, President and CEO of Mercedes-Benz USA, was quoted stating: "We are honored and humbled to have Mercedes-Benz associated with this magnificent Amphitheater." CITY OF TUSCALOOSA AND MERCEDES-BENZ CELEBRATE RENAMING OF THE NEW MERCEDES-BENZ AMPHITHEATER (Nov. 7, 2023), https://mbusi.com/wp-content/uploads/2024/05/Mercedes-Benz-and-City-of-

Tuscaloosa-announce-renaming-of-Tuscaloosa-Amphitheater.pdf. This same Press Release further states that "MBUSA is also responsible for Mercedes-Benz Vans in the U.S." *Id.*

53. In a more recent press release from MBUSA, MBUSA highlights its operational connection with MBV Charleston, stating "Mercedes-Benz Vans is celebrating a global milestone with the production of five million Sprinter vans. The five-millionth vehicle – an all-electric eSprinter – was assembled at the company's facility in Charleston, South Carolina" and "[f]or nearly 20 years, the Charleston plant has played a vital role for our Sprinter in North America." 30 YEARS, 5 MILLION MERCEDES-BENZ SPRINTER: A GLOBAL SUCCESS STORY (May 5, 2025), https://media.mbusa.com/releases/release-320add2728d8a4c7f104af837406b986-30-years-5-million-mercedes-benz-sprinter-a-global-success-story.

54. According to an April 7, 2025, MBUSA press release, MBUSA reported "Q1 2025 group sales of 67,400 Passenger Cars. Additionally, Mercedes-Benz Vans reported Q1 2025 group sales of 7,700 units, bringing MBUSA to a total of 75,100 vehicles for the first quarter of the year." MBUSA reports that the Tuscaloosa facility, MBUSI, expanded personalization options for exterior colors, paving the way for customers to enjoy greater customization on select models. MERCEDES-BENZ USA REPORTS YEAR-OVER-YEAR PASSENGER CAR SALES GROWTH FOR Q1 2025 (April 7, 2025), https://media.mbusa.com/releases/release-

c0a58ca8275d1d84f5a0b703fb0292e8-mercedes-benz-usa-reports-year-over-year-passenger-car-sales-growth-for-q1-2025.

**B. Defendants Did Not Pay Plaintiffs and Class Members for All Hours Worked**

55. This is an action brought on behalf of individuals who are current and former non-exempt employees by Defendants, challenging Defendants' unlawful failure to pay for "off-the-clock" work during meal breaks and prior to and after Plaintiffs' and Class Members' regularly scheduled shifts, without receiving compensation for such "off-the-clock" activities in violation of the FLSA and SCPWA.

56. Plaintiffs and other Class Members are not members of a union.

57. Plaintiff Ford worked as a non-exempt hourly employee in the Mercedes-Benz Vans manufacturing plant located in Ladson, South Carolina from May 2022 to November 2024.

58. Plaintiff Ford worked as a "Team Member" in Defendants' Production/Assembly Department.

59. Plaintiff Ford typically worked from 6:05 a.m. to 2:15 p.m. Monday through Friday and usually worked an extra eight (8) hour shift once per month.

60. Plaintiff Ford was paid an hourly rate of $19.50 per hour.

61. Plaintiff Russell worked as a non-exempt hourly employee in the Mercedes-Benz manufacturing plant located in Vance, Alabama from September

2022 to April 2025.

62. Plaintiff Russell worked as a "Team Member" in Defendants' Production/Assembly Department.

63. Plaintiff Russell typically worked from 6:15 a.m. to 5:20 p.m. Monday through Thursday and usually worked an extra shift every other week.

64. Plaintiff Russell was paid an hourly rate of $28.50 per hour.

65. Plaintiff Smith worked as a non-exempt hourly employee in the Mercedes-Benz manufacturing plant located in Vance, Alabama from September 2022 to the present.

66. Plaintiff Smith worked as a "Team Member" in Defendants' Paint Shop.

67. Plaintiff Smith typically worked from 6:00 a.m. to 6:00 p.m. four to five days per week.

68. Plaintiff Smith was paid an hourly rate of $30.50 per hour.

69. At all relevant times, Defendants maintained a policy and practice whereby hourly employees are encouraged and/or required to work off-the-clock.

70. Indeed, Plaintiffs and Class Members are often required to work through meal breaks without proper compensation. Specifically, Defendants automatically deduct thirty (30) minute meal breaks from Plaintiffs' paychecks, whether a meal break is actually taken.

71. Plaintiff Ford was required to work through his meal breaks about

once per week. Despite working through meal breaks, Defendants automatically deducted thirty (30) minutes from his paychecks.

72. Plaintiff Russell was required to work through his meal breaks approximately two (2) times per month. Despite working through his meal breaks, Defendants automatically deducted thirty (30) minutes from his paychecks.

73. Considering that Plaintiffs and Class Members have worked forty (40) or more hours during weekly pay periods, had they properly been compensated for all "off-the-clock" work, such time working through meal breaks would have been added to their overtime hours and treated as overtime for purposes of calculating and computing overtime compensation under the FLSA.

74. Defendants knew or should have known that the work that they required of Plaintiffs and other Class Members should have been paid for all time worked during meal breaks under the FLSA and SCPWA.

75. Defendants require Plaintiffs and Class Members to don and doff Personal Protective Equipment (PPE) that is provided by and required by Defendants off-the-clock before and after their schedule shifts.

76. Defendants' Employee Safety Manual explains that "Typical hazards for which PPE provides protection are impact, penetration, compression (roll-over), chemical, heat/cold, harmful dust, light (optical) radiation, and biologic hazards which cannot practically be eliminated." MBUSI, 2024 Safety One Manual, p. 205.

77. Defendants' Safety Manual states that all Plaintiffs and Class Members must wear steel-toed safety shoes and safety glasses with side shields or wrap-around style while in the shops. The Safety manual further requires Plaintiffs and Class Members wear hearing protection and hand protection, where required. *Id.*, p. 206.

78. Defendants' Manual also provides that additional PPE may be required for specific tasks. Additional PPE may include: bumps caps, hard hats, safety vests, arm protection, fresh air supplied hoods/Powered Air Purifying Respirators, splash googles/face shields, chemical protective clothing, welding clothing, and gloves. *See id.*, pp. 206–207.

79. MBUSI's website further states that for the Paint Shop, "Team Members . . . must wear special suits and headgear to prevent unwanted particles from entering the Paint Shop." *Factory, The Paint Shop*, MBUSI, https://mbusi.com/factory/paint-shop (last visited July 21, 2025). For Assembly, "All Team Members . . . wear 'Team Wear" which includes special protective belts and protective watch coverings to prevent them from scratching the body. In addition, Team Members wear special work shoes that do not allow Electrostatic Discharge. The prevention of electrostatic discharge is essential in preventing damage to computer components during assembly." *Factory, Assembly*, MBUSI, https://mbusi.com/factory/assembly (last visited July 21, 2025).

80. Defendants provide training to Plaintiffs and Class Members on when

PPE is necessary; what PPE is required; how to properly put on, take off, adjust and wear PPE: the limitations of PPE; and the proper care, maintenance, useful life and disposal of PPE. *Id.*, p. 209.

81. Defendants require that Plaintiffs and Class Members arrive to their work shifts sufficiently early to don essential PPE and be dressed and ready prior to the beginning of their shifts.

82. To be on time for their scheduled start shifts, Plaintiffs arrived at Defendants' facilities between fifteen (15) and forty (40) minutes prior to their shift start time so that they could report to their workstation in their PPE by their shift start times.

83. Plaintiffs and Class Members cannot begin working without donning the required protective gear.

84. Prior to their scheduled shift time, Plaintiffs and Class Members routinely perform a variety of activities that constituted compensable work, including but not limited to:

a. walking to Defendants' time clock;

b. walking to Defendant's locker room/changing area;

c. donning specialized protective equipment and clothing issued and stored by Defendants, including safety boots, safety glasses, gloves, face shields, and other PPE where necessary, and

d. walking to the work deck to report to their scheduled shifts.

85. If Plaintiffs and Class Members arrive at Defendants' plants at their scheduled shift start times, they would be considered tardy for their shifts because they would not be dressed and ready in their PPE.

86. Defendants do not allow Plaintiffs and Class Members to take PPE out of the building. Rather, Defendants require the PPE to be stored on Defendants' premises to avoid any potential contamination with the vehicle paint.

87. Defendants fail to pay Plaintiffs and Class Members for the time spent working prior to beginning of their scheduled shift.

88. Defendants begin paying Plaintiffs and Class Members at their scheduled shift start time, regardless of the work they were required to do prior to the scheduled shift start.

89. Plaintiffs and Class Members cannot leave Defendants' premises during their meal break because it would require them to don and doff their PPE and there was not enough time to do so.

90. Plaintiffs and Class Members are required to work until the end of their shifts. Once their shifts end, they are then required to perform the time-consuming task of doffing their PPE and returning the PPE to the appropriate location. This work takes approximately five (5) to ten (10) minutes.

91. Defendants stop paying Plaintiffs and the Class Members at the time their scheduled shift ends and do not pay them for doffing their specialized protective equipment or any other work.

92. Regardless of the time they swipe in and out for their shifts, Plaintiffs' and Class Members' hours are adjusted to reflect their shift start and shift end times.

93. All of the unpaid pre-shift and post-shift work performed is an integral and indispensable part of the principal work activities of Plaintiffs and Class Members.

94. Considering that Plaintiffs and Class Members have worked forty (40) or more hours during weekly pay periods, had they properly been compensated for all "off-the-clock" work, such time would have been added to their overtime hours and treated as overtime for purposes of calculating and computing overtime compensation under the FLSA.

95. Defendants knew or should have known that the work that they required of Plaintiffs and other Class Members should have been paid for all time worked before and after their regularly scheduled shift under the FLSA and SCPWA.

### C. The Off-the-Clock Work Results in Viable Gap Time Claims in Weeks When the Class Members Worked Less Than Forty Hours

96. "Gap time" refers to the hours that fall between a nonexempt employee's regularly scheduled hours and the 40 hours that an employee must work before becoming entitled to overtime pay. When an employee is scheduled to work 40 hours per week, there is no gap time. But for employees working fewer

than 40 hours – 37.5 hours per week, for example – gap time is time worked between 37.5 and 40 hours.

97. Plaintiffs and other Class Members sometimes worked less than forty (40) hours in a workweek. In such workweeks, the off-the-clock work described herein constitutes unpaid gap time, for which Plaintiffs and the Class Members are entitled to be paid at their regular hourly rates of pay.

**D. Defendants Did Not Pay the Proper Overtime Rate to Plaintiffs and Class Members.**

98. Defendants also failed to pay Plaintiffs and Class Members the appropriate overtime rate of compensation for overtime work performed.

99. Pursuant to the FLSA, non-discretionary bonuses are included in an employee's regular rate of pay unless they qualify as excludable under another statutory provision. According to the U.S. Department of Labor, which is charged with overseeing implementation of the FLSA, "[e]xamples of nondiscretionary bonuses that must be included in the regular rate" of pay for purposes of calculating and paying overtime compensation include:

- Bonuses based on a predetermined formula, such as individual or group production bonuses;
- Bonuses for quality and accuracy of work;
- Bonuses announced to employees to induce them to work mor efficiently;

- Attendance bonuses; and
- Safety bonuses (*i.e.*, number of days without safety incidents).

U.S. Dept. of Labor, Wage & Hour Div., *Fact Sheet #56C: Bonuses under the Fair Labor Standards Act (FLSA)*.

100. Plaintiffs and Class Members are paid several forms of non-discretionary compensation in addition to their hourly rate of pay, including *inter alia*, perfect attendance bonuses, cash bonuses, emergency pay, quarterly production bonuses, annual team share bonuses, and double time for specific shifts (collectively, "non-discretionary bonuses").

101. Defendants pay these non-discretionary bonuses to Plaintiffs and Class Members, but Defendants failed to include certain of such bonuses in the "regular rate" used to calculate the overtime rate of pay for Plaintiffs and Class Members in the weeks that the bonuses were paid. Defendants' failure has resulted in Plaintiffs and Class Members receiving lower overtime rates than they were owed for the weeks in which the bonuses were paid.

102. For example, Plaintiff Ford's pay statement, dated January 1, 2023, shows that he received a $100 "Perfect Attendance" bonus for attending all his regularly scheduled shifts for three months. However, this non-discretionary bonus was not included in the calculation of his regular rate of pay. Rather, Plaintiff Ford's overtime compensation was calculated at $29.25 per hour, 1.5x his hourly rate of $19.50.

103. Likewise, Plaintiff Smith's pay statement, dated June 17, 2025, shows that he received a $200 "Perfect Attendance" award. However, this non-discretionary bonus was not included in the calculation of his regular rate of pay. Rather, Plaintiff Smith's overtime compensation was calculated at $45.75 per hour, 1.5x his hourly rate of $30.50.

104. The non-discretionary bonuses are based on a pre-determined formula that is advertised to Defendants' non-exempt employees in advance.

105. The non-discretionary bonuses are paid as part of Plaintiffs' and Class Members' usual wages and treated as compensation along with Plaintiffs' and the Class Members' compensation.

106. Defendants knew or should have known that the non-discretionary bonuses that they paid should have been properly incorporated into the regular rate for purposes of calculating overtime compensation under the FLSA.

107. Defendants knew Plaintiffs and Class Members were entitled to proper calculation of overtime wages for all hours worked over forty (40) in a workweek because Defendants classified Plaintiffs and Class Members as non-exempt under the FLSA and SCPWA.

**E. Defendants Willfully Violated the FLSA and South Carolina Laws**

108. Defendants' actions in violation of the FLSA were and are made willfully in an effort to avoid liability under the FLSA and state law. Such

willfulness is demonstrated by, or may be reasonably inferred from, Defendants' actions and failures to act.

109. Defendants do not maintain accurate records of the actual hours that Plaintiffs and Class Members worked each workday and the total hours worked each workweek.

110. Defendants knew or should have known that the work that they required of Plaintiffs and other Class Members should have been paid for all time worked before and after their regularly scheduled shift under the FLSA and state law and working through meal breaks.

111. Defendants knew or should have known that the non-discretionary bonuses that they paid should have been properly incorporated into the regular rate for purposes of calculating overtime compensation under the FLSA and state law.

112. Defendants are a sophisticated international business with access to knowledgeable human resource specialists and competent labor counsel who can and should advise Defendants of their obligations under the FLSA and South Carolina state law.

113. Defendants acted willfully and with reckless disregard of clearly applicable FLSA and South Carolina law by failing to compensate Plaintiffs and Class Members for all hours worked, including overtime for hours in excess of forty (40) during the workweeks.

114. Defendants have not made good faith efforts to comply with the FLSA and South Carolina state law.

## COLLECTIVE ACTION ALLEGATIONS

115. Plaintiffs bring this lawsuit pursuant to 29 U.S.C. § 216(b) as a collective action on behalf of the Collectives defined above.

116. Plaintiffs desire to pursue this FLSA claim on behalf of any individuals who opt-in to this action pursuant to 29 U.S.C. § 216(b).

117. Plaintiffs and the members of the Collectives are "similarly situated," as that term is used in 29 U.S.C. § 216(b), because, inter alia, all such individuals worked pursuant to the Defendants' previously described common pay and timekeeping practices and, as a result of such practices, were not paid the full and legally mandated overtime premium for hours worked over forty (40) during the workweek. Resolution of this action requires inquiry into common facts, including, inter alia, Defendants' common compensation, timekeeping and payroll practices.

118. The members of the Collectives have the same or closely similar job duties as the Plaintiffs, and Plaintiffs and members of the Collectives were paid by Defendants in the same manner, in violation of the FLSA. Accordingly, the named Plaintiffs are similarly situated to all members of the Collectives.

119. Plaintiffs and the members of the Collectives performed the same type of work, the manner and terms of which were controlled by the Defendants

and were not paid for all time worked or at the proper overtime rate as required by federal law.

120. The similarly situated employees are known to Defendants, are readily identifiable, and may be located through Defendants' records.

121. Defendants employ many members of the Collectives throughout the United States. These similarly situated employees may be readily notified of this action through direct U.S. mail and/or other appropriate means and allowed to opt into it pursuant to 29 U.S.C. § 216(b) for the purpose of collectively adjudicating their claims for overtime compensation, liquidated damages (or, alternatively, interest), and attorneys' fees and costs under the FLSA.

## CLASS ACTION ALLEGATIONS

122. Plaintiff Ford incorporates by reference the foregoing allegations as if set forth herein.

123. Plaintiff Ford brings this action as a class action pursuant to FED. R. CIV. P. 23 on behalf of himself and the SCPWA Classes defined above.

124. The members of the SCPWA Classes are so numerous that joinder of all members is impracticable. Upon information and belief, there are more than 100 members of each the South Carolina Class and South Carolina Regular Rate Class.

125. Defendants have engaged in the same conduct towards Plaintiff Ford and the other members of the SCPWA Classes.

126. The injuries and damages to the SCPWA Classes present questions of law and fact that are common to each class member within the SCPWA Classes, and that are common to the SCPWA Classes as a whole.

127. Plaintiff Ford will fairly and adequately represent and protect the interests of the SCPWA Classes and all of its proposed class members because there is no conflict between the claims of Plaintiffs and those of the SCPWA Classes, and Plaintiff's claims are typical of the claims of the SCPWA Classes

128. Plaintiff Ford's counsel are competent and experienced in litigating class actions and other complex litigation matters, including wage and hour cases like this one.

129. Class certification is appropriate under FED. R. CIV. P. 23(B)(3) because questions of law and fact common to the SCPWA Classes predominate over any questions affecting only individual Class members including, without limitation: whether Defendants failed to pay them the full amount of overtime compensation earned.

130. Plaintiff Ford's claims are typical of the claims of the SCPWA Classes in the following ways, without limitation: (a) Plaintiff is a member of the South Carolina Class; (b) Plaintiff Ford's claims arise out of the same policies, practices and course of conduct that form the basis of the claims of the SCPWA Classes; (c) Plaintiff Ford's claims are based on the same legal and remedial theories as those of the SCPWA Classes and involve similar factual circumstances; (d) there are no

conflicts between the interests of Plaintiff Ford and the members of the SCPWA Classes; and (e) the injuries suffered by Plaintiff Ford are similar to the injuries suffered by the South Carolina Class members.

131. Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated individuals to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. The SCPWA Classes are readily identifiable from Defendants' own employment records. Prosecution of separate actions by individual members of the SCPWA Classes would create the risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

132. A class action is superior to other available methods for adjudication of this controversy because joinder of all members is impractical. Further, the amounts at stake for many of members and the SCPWA Classes, while substantial, are not great enough to enable them to maintain separate suits against Defendants.

133. Without a class action, Defendants will unjustly retain the benefit of their wrongdoing, which will result in further damages to Plaintiff Ford and the

South Carolina Class. Plaintiff Ford envisions no difficulty in the management of this action as a class action.

**COUNT I**
**Violation of the FLSA - Overtime**
**(On Behalf of Plaintiffs and the FLSA Collective and Regular Rate Collective)**

134. Paragraphs 1-133 are incorporated as though fully set forth herein.

135. The FLSA requires that covered employees be compensated for all hours worked in excess of forty (40) hours per week at a rate not less than one and one-half (1 ½) times the regular rate at which he or she is employed. *See* 29 U.S.C. § 207(a)(1).

136. The FLSA defines the "regular rate" as including "all remuneration for employment paid to, or on behalf of, the employee…." 29 U.S.C. § 207(e).

137. With a few limited exceptions, all remuneration given to an employee must be included in the employee's regular rate calculation. 29 U.S.C. § 207(e); 29 C.F.R. § 778.108.

138. Defendants are subject to the wage requirements of the FLSA because Defendants are "employers" under 29 U.S.C. § 203(d).

139. At all relevant times, Defendants were "employers" engaged in interstate commerce and/or in the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 203.

140. At all relevant times, Plaintiffs and members of the Collectives were covered employees entitled to the above-described FLSA protections. *See* 29 U.S.C.

§ 203(e).

141. Plaintiffs and members of the Collectives are not exempt from the requirements of the FLSA.

142. Plaintiffs and members of the Collectives are entitled to be paid overtime compensation for all hours worked over forty (40) in a workweek pursuant to 29 U.S.C. § 207(a)(1).

143. Defendants' compensation scheme applicable to Plaintiffs and members of the Collectives failed to comply with either 29 U.S.C. § 207(a)(1) or 29 C.F.R. § 778.112.

144. Defendants knowingly failed to compensate the Plaintiffs and members of the Collectives for all hours worked when they worked in excess of forty (40) hours per week and failed to pay proper overtime premiums at a rate of one and one-half (1½) times their regular rate of pay, in violation of 29 U.S.C. § 207(a)(1) and 29 C.F.R. § 778.112.

145. Moreover, Defendants have failed to include non-discretionary bonuses in calculating the Plaintiffs' and the Regular Rate Collective Members' "regular rate" for the purpose of calculating the applicable time-and-a-half overtime premium, and Defendants have failed to compensate the Plaintiffs and Collective Members for off-the-clock work.

146. Defendants also failed to create, keep and preserve records with respect to work performed by the Plaintiffs and the members of the Collectives

sufficient to determine their wages, hours and other conditions of employment in violation of the FLSA, 29 U.S.C.A. § 211(c); 29 C.F.R. §§ 516.5(a), 516.6(a)(1), 516.2(c).

147. In violating the FLSA, Defendants acted willfully and with reckless disregard of clearly applicable FLSA provisions.

148. Defendants are liable to Plaintiffs and other members of the Collectives for actual damages, liquidated damages and equitable relief, pursuant to 29 U.S.C. § 216(b), as well as reasonable attorneys' fees, costs and expenses.

**COUNT II**
**South Carolina Payment Of Wages Act, S.C. Code Ann. § 41-10-30**
**(On Behalf of the Plaintiff Ford and the South Carolina Class and South Carolina Regular Rate Class Against Defendants MB AG, MBG, MBUSA, and MBV Charleston)**

149. Paragraphs 1-133 are incorporated herein by reference.

150. Plaintiff Ford and similarly situated non-exempt employees seek to recover wages for all the times they worked "off the clock" and worked less than forty (40) hours in a work week. During those work weeks Plaintiff and members of the SCPWA Classes are seeking to recover their regular hourly rate.

151. At all relevant times, Defendants were "employers" as defined by S.C. Code § 41-10-10(1).

152. At all relevant times, Plaintiff and members of the SCPWA Classes were covered employees of Defendants.

153. Defendants MB AG, MBG, MBUSA, and MBV Charleston failed to

pay "wages," as defined by S.C. Code §41-10-10(2), and pursuant to Plaintiff's employment agreement.

154. S.C. Code §41-10-10(2) defines "wages" as all amounts at which labor rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or other method of calculating the amount and includes vacation, holiday, and sick leave payments which are due to an employee under any employer policy or employment contract.

155. Defendants MB AG, MBG, MBUSA, and MBV Charleston violated Plaintiff's and the South Carolina Class Members' employment agreement and the South Carolina Payment of Wages Act by not compensating Plaintiff and similarly situated non-exempt employees, for the compensable "off the clock" work they performed.

156. Defendants MB AG, MBG, MBUSA, and MBV Charleston further violated Plaintiff's and the South Carolina Class Members' employment agreement and the South Carolina Payment of Wages Act by not compensating Plaintiff and similarly situated non-exempt employees at proper overtime premiums at a rate of one and one-half (1½) times their regular rate of pay for all hours worked in excess of forty (40) hours per week.

157. Plaintiff Ford and members of the SCPWA Classes are owed wages pursuant to the South Carolina Payment of Wages Act because the Defendants MB AG, MBG, MBUSA, and MBV Charleston did not pay Plaintiff and members of the

SCPWA Classes their wages due per their employment agreement.

158. Defendants MB AG, MBG, MBUSA, and MBV Charleston refused to pay Plaintiff's wages due, as required by S.C. Code §41-10-40 and -50.

159. Pursuant to S.C. Code §41-10-80(C), Plaintiff and members of the SCPWA Classes are entitled to recover in this action an amount equal to three times the full amount of their unpaid wages, plus costs and reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek the following relief on behalf of themselves and all others similarly situated:

a. An order permitting this litigation to proceed as an FLSA collective action pursuant to 29 U.S.C. § 216(b);

b. An order permitting this litigation to proceed as a class action pursuant to FED. R. CIV. P. 23 on behalf of the SCPWA Classes;

c. Prompt notice, pursuant to 29 U.S.C. § 216(b), of this litigation to all potential FLSA Collective members;

d. For unpaid wages as may be owed and prejudgment interest to the fullest extent permitted under the law;

e. Liquidated damages to the fullest extent permitted under the law;

f. Treble damages for the SCPWA Classes pursuant to the South Carolina Payment of Wages Act;

a. Litigation costs, expenses and attorneys' fees to the fullest extent permitted under the law; and

b. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury for all issues of fact.

Dated: August 4, 2025

Respectfully Submitted,

*/s/ Daniel Werner*
Daniel Werner
Georgia Bar No. 422070
dwerner@radfordscott.com
RADFORD SCOTT LLP
125 Clairemont Ave., Suite 380
Decatur, Georgia 30030
Telephone: (678) 271-0300

Camille Fundora Rodriguez*
Olivia S. Lanctot*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-4635
crodriguez@bergermontague.com
olanctot@bergermontague.com

Mariyam Hussain*
**BERGER MONTAGUE PC**
110 N. Wacker Drive, Suite 2500
Chicago, IL 60606
Tel.: (773) 666-4316
mhussain@bergermontague.com

* *Pro hac vice forthcoming.*

**CERTIFICATE OF COMPLIANCE**

This is to certify that on August 4, 2025, I prepared the foregoing in Book Antiqua, 13-point type in accordance with L.R. 5.1(C).

/s/ Daniel Werner
Daniel Werner
Co-Counsel for Plaintiffs